IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-01922-MSK-CBS

MICHELLE GIELAS,

    Plaintiff,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,

    Defendant.

**OPINION AND ORDER REMANDING CASE**

THIS MATTER comes before the Court upon review of the Defendant Life Insurance Company of North America's ("LINA") denial of long-term disability benefits to the Plaintiff ("Ms. Gielas") under an insurance plan governed by the Employment Retirement Income Security Act of 1974, 28 U.S.C. § 1001, *et seq.* ("ERISA"). The parties filed a Stipulated Administrative Record (**#21**) and agreed to have the matter determined on their briefs (**#23, 24, 28, 29**) and oral argument. Having reviewed the record and considered the written and oral arguments of the parties, the Court finds and concludes as follows.

**I.    JURISDICTION**

With regard to denial of claims brought pursuant certain employee benefit plans known as ERISA plans, 29 U.S.C. § 1132(a)(1)(B), provides:

    A civil action may be brought –
    (1)    by a participant or beneficiary – . . .

1

>       (B)   to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

There is no dispute that the plan under which Ms. Gielas sought benefits qualifies for this review. Accordingly, this Court exercises jurisdiction in this matter pursuant to 29 U.S.C. §1331.

## II.   ISSUE PRESENTED

During her employment, Ms. Gielas was a plan participant under a group long-term disability policy purchased from through her employer from LINA (group policy number VTL-050164, referred to as the "Policy"). LINA was both the underwriter the long-term disability benefits plan administrator.

In January 2005, Ms. Gielas fell and hit her head. She received medical treatment, but despite such treatment, continued to suffer from persistent hyper-sensitivity to noise and light, stuttering and difficulties with speech, migraines, fatigue, depression, and anxiety. In May 2005, Ms. Gielas submitted a claim for long-term disability benefits. On July 22, 2005, LINA denied Ms. Gielas' claim, reasoning that there was no evidence of an ongoing condition that would prevent her from working. On March 22, 2006, after a lengthy appeal, LINA approved the claim and paid benefits.

Then, on August 16, 2007, LINA terminated Ms. Gielas disability benefits. Following two appeals of the termination decision, on July 25, 2008, LINA issued a final decision denying Ms. Gielas future benefits. It is from this decision that Ms. Gielas seeks relief.

The parties disagree both as to the applicable standard of review, and as to whether denial of Ms. Gielas' claim was appropriate. Ms. Gielas argues that the Court should review the case

*de novo*; LINA argues that its decision should be subject to review under and an arbitrary and capricious standard.

## III.     FACTUAL BACKGROUND

### A.     THE POLICY

The Policy was issued on July 1, 1997 in Illinois, and by its terms is governed by Illinois law.[1]  It provides in pertinent part that LINA will pay disability benefits if an insured becomes disabled while covered under the Policy.[2]  Under the Policy, an insured is considered "disabled" if,  because of injury or sickness, :

> 1. He or she is unable to perform all the material duties of his or her regular occupation, or solely due to injury or sickness, he or she is unable to earn more than 80% of his or her indexed covered earnings, and
>
> 2. After disability benefits have been payable for 24 months, he or she is unable to perform all the material duties of any occupation for which he or she may reasonably become qualified based on education, training or experience, or solely due to injury or sickness, he or she is unable to earn more than 80% of his or her indexed covered earnings.

With regard to claim allowance, the Policy provides that

> Satisfactory proof of Disability must be provided to the Insurance Company, at the Employee's expense, before benefits will be paid.  The Insurance Company will require continued proof of the Employee's Disability, provided at the Employee's expense, for benefits to continue.

With regard to termination of benefits, the Policy states that disability benefits will end

---

[1] The Policy is a group policy, held by Contractors Insurance Trust.  The Plaintiff's former employer, Forfeiture Support Associates, LLC, is the subscriber on the Policy, effective October 1, 2004.

[2] Disability Benefits" are defined as "the lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearer [sic] dollar or the Maximum Disability Benefit [of $5,000], reduced by any Other Income Benefits."

on "the date the Insurance Company determines an Employee is not disabled."

      **B.**      **MS. GIELAS'S CLAIM**

On January 14, 2005, Ms. Gielas, then employed as a finance specialist at Forfeiture Support Associates LLC in Virginia, slipped and hit her head on cement stairs. She went to the emergency room, where she was diagnosed with a contusion, given anti-nausea medications, and sent home. On January 17, 2005, Ms. Gielas returned to the emergency room, complaining of memory problems, blurred vision, and continued nausea. She underwent an MRI, which revealed "no intracranial abnormality." An emergency room doctor diagnosed Ms. Gielas with a concussion and referred her to neurologist Tajammul Ehsan.

Ms. Gielas complained to Dr. Ehsan of irritability, emotional problems, headaches, hypersensitivity to light and sound, and cognitive problems. Dr. Ehsan examined her and ordered an EEG test, which had normal results. His diagnosis was that Ms. Gielas suffered from post-concussive syndrome. He prescribed anti-anxiety medications, and suggested that she attend speech therapy. From January to September 2005, Ms. Gielas was treated by Dr. Ehsan, who continued to prescribe anti-anxiety medications, anti-depressants, and pain medications. She also followed Dr. Ehsan's advice and attended speech therapy sessions, during which her difficulty with word-finding and word-substitution problems were noted.

On February 15, 2005, Ms. Gielas was terminated by her employer due to her inability to perform her job duties. Shortly thereafter, she applied for long term disability benefits. LINA initially denied Ms. Gielas's application, based on its conclusion that her test results were normal and her impairments were mild. In evaluating the application, LINA considered the opinions of and statements by a number of medical professionals:

>Dr. Ehsan reported that Ms. Gielas had normal MRI, EEG, and CT scan results, normal speech, and normal movement. He also noted that Ms. Gielas continued to report that she was experiencing sensitivity to sound, cognitive problems, and problems with memory and concentration. Dr. Ehsan opined that Ms. Gielas's condition was stable, and reported that she was awaiting a psychiatric evaluation for anxiety and treatment for sound sensitivity.
>
>Dr. Fields, a psychiatrist, began treating Ms. Gielas in June 2005. He diagnosed Ms. Gielas as suffering from attention deficit disorder, mood disorder, cognitive disorder, and stuttering, but did not opine as to whether Ms. Gielas was disabled.
>
>Dr. Hebda, a neuropsychologist, performed an evaluation and diagnosed Ms. Gielas with a cognitive disorder, with relative deficits in mental stamina, attnetion, processing speed, memory, and complex problem-solving skills. Dr. Hebda reported that Ms. Gielas had average to high-average memory skills, but that her memory testing scores were lower than her intellectual abilities. Ms. Gielas had low scores in attention span, processing speed for tasks, and in her ability to solve moderately complex problems. Dr. Hebda opined that these symptoms caused mild impairment, and would cause problems in social and occupational functioning.
>
>Dr. Palombi, a psychiatrist who saw Ms. Gielas once. Dr. Palombi refused to opine as to whether Ms. Gielas was disabled.

Shortly after LINA denied benefits, Dr. Fields opined that Ms. Gielas likely would never regain her pre-injury cognitive function and therefore would not be able to return to her previous job position. A lengthy appeal process ensued.

LINA requested updated medical opinions and enlisted the services of an independent clinical psychologist, Dr. John Shallcross, who reviewed Ms. Gielas's file and contacted her treating physicians, including Drs. Ehsan and Fields.[3] Based on his review, Dr. Shallcross opined that Ms. Gielas had "a global psychiatric/neurocognitive impairment" that would

---

[3] Dr. Shallcross also contacted neurologist Dr. Ruben Cintron, with whom Ms. Gielas consulted several times. After examining Ms. Gielas and performing tests, Dr. Cintron diagnosed her as having post-concussion syndrome with headaches, fatigue, and problems with concentration, cognition, and attention – all of which prevented her from working.

5

preclude her from performing her former occupation through February 2006.  Based on Dr. Shallcross's opinion, LINA approved Ms. Gielas's long term disability claim and began paying benefits in March 2006.

Ms. Gielas moved to Colorado in the summer of 2006.

### C. TERMINATION OF MS. GIELAS'S DISABILITY BENEFITS

After paying 24 months of long term disability benefits, LINA undertook an inquiry as to whether Ms. Gielas continued to be disabled under the terms of the Policy.  In this review, LINA considered documents from and statements by:

> Dr. Witty, a psychologist, who performed an independent evaluation in August 2007.  Dr. Witty diagnosed Ms. Gielas with a depressive order, histrionic and obsessive compulsive personality features, tinnitus (ringing of the ears) and hyperacusis (sensitivity to sound), and a cognitive disorder, resulting in problems with attention, concentration, perception, and psychomotor speed.  Dr. Witty stated that Ms. Gielas's symptoms would affect her abilities to interact and communicate with people, to complete tasks in a timely fashion, to absorb information and make accurate inferences, and to multi-task, and opined that Ms. Gielas could not return to her previous position, but could work in a less challenging job, subject to certain limitations, including a quiet work environment and limited stress in the workplace.
>
> Dr. Evans, Ms. Gielas's treating clinical psychologist, opined that Ms. Gielas could return to her regular work, based on a neuropsychological evaluation by a Dr. Gant.  (Dr. Gant's evaluation was not presented to LINA, and is not in the record.)
>
> Dr. Fox, Ms. Gielas's regular treating family physician, stated in May and June 2007 that Ms. Gielas could not return to work.
>
> Dr. Woodcock, Ms. Gielas's regular treating neurologist beginning in November 2006, opined that Ms. Gielas could not perform work due to her fatigue, cognitive impairments, inability to handle sensory inputs, and headaches that increased with activity.  Dr. Woodock opined further that any resumption of work would likely exacerbate Ms. Gielas's symptoms and erode her ability to function.

In August 2007, LINA requested supplemental opinions from Drs. Fox and Woodcock addressing Dr. Evans's conclusion that Ms. Gielas could return to work.  LINA gave each doctor

a week to respond. Dr. Fox deferred to Dr. Evans's opinion. Dr. Woodcock did not respond.

Based on Dr. Evans's opinion, Dr. Fox's deference to Dr. Evans, and Dr. Woodcock's failure to respond, LINA found there was no objective evidence to support a conclusion that Ms. Gielas continued to be disabled. As a consequence, LINA terminated Ms. Gielas's long-term disability benefits on August 16, 2007.

Ms. Gielas appealed the termination of her benefits. In the appeal process, LINA forwarded Ms. Gielas's files to Dr. D. Ashley Cohen, an independent clinical psychologist, and to Dr. Norton Hall, LINA's in-house physician, for review. Drs. Cohen and Hall reviewed Ms. Gielas's records, but did not see or speak to her. In a brief, one-paragraph opinion, Dr. Hall found that there were no significant clinical findings to support a conclusion that Ms. Gielas could not work. Dr. Cohen wrote a more detailed opinion, in which he discounted three doctors' reports that concluded that Ms. Gielas could not work. He criticized: (1) Dr. Hebda's opinions as lacking objective medical findings, and concluded that his report failed to show that Ms. Gielas had any neurological impairments; (2) Dr. Shallcross's opinion as contradictory, because Dr. Shallcross noted inconsistencies and exaggerations, but nonetheless opined that Ms. Gielas could no longer work; and (3) Dr. Witty's opinion as containing unsupported, sweeping conclusions.[4] Dr. Cohen noted that the results from Ms. Gielas's various neurological tests were normal and that her medical care providers consistently found her to have average to above-average abilities. Accordingly, Dr. Cohen concluded that nothing in the record indicated that Ms. Gielas suffered from a serious mental disorder or cognitive deficit and that she could return

---

[4] Dr. Cohen did not discuss the opinions of any other of Ms. Gielas's medical care providers.

to her previous occupation.

In December 2007, LINA upheld its termination of benefits.  Based on Dr. Cohen's and Dr. Hall's opinions, LINA concluded that "the records fail to provide consistent, independently documented, objective evidence of any serious mental disorder or significant cognitive deficit that would prevent [Ms. Gielas] from engaging in sustained employment.  There were no reliable cognitive findings that [Ms. Gielas] would be unable to perform work tasks of the types found in many occupations."  There are no findings, however, nor any evidence in the administrative record that reflect an inquiry as to the level of cognitive function required for Ms. Gielas to perform her previous occupation or as to whether Ms. Gielas could perform work that would allow her to earn 80% of her indexed covered earnings.

Ms. Gielas pursued a second appeal.  She underwent a vocational evaluation by non-physicians Doris Shriver and Shari Barta, who opined that she could not maintain gainful employment and was not a good candidate for vocational rehabilitation.  Dr. Evans issued another opinion, in which he explained that he believed that Ms. Gielas's problems were not neurological or neuropsychological in nature, but rather psychological.  Dr. Evans clarified that his earlier opinion was directed to the narrow question of whether Ms. Gielas had neurological or neuropsychological problems that would prevent her from working.  In his clarification, he stated that he believed that even in the absence of neurological or neuropsychological problems, Ms. Gielas's psychological problems would preclude her from returning to her previous employment.

In July 2008, LINA again upheld its decision to terminate benefits.  It dismissed Ms. Shriver's and Ms. Barta's opinions as baseless, and relied extensively on Dr. Cohen's review of

Ms. Gielas's file to arrive at the conclusion that "no clear, convincing, reliable, well-documented scientific evidence" existed to establish that Ms. Gielas suffered from a cognitive or psychiatric condition that would prevent her from working. In response to that decision, Ms. Gielas initiated the lawsuit now before the Court.

## IV.     ANALYSIS

### A.     STANDARD OF REVIEW

Because the parties dispute what standard of review applies, the Court begins with this issue. ERISA does not prescribe a standard of review in actions, such as this, brought pursuant to § 1132(a)(1)(B). Generally, a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard, however, if a benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the plan administrator's actions are reviewed using an arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Whether a plan administrator has such discretion is determined by the terms of the plan. *See id.* Although a plan may provide that its interpretation is governed by particular state law,[5] federal ERISA law preempts state law[6] in order to encourage "uniformity of decisions under ERISA." *Hammond v. Fidelity & Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir. 1992). Thus, the Court applies federal law that governs the interpretation of the Policy with regard to whether it gives LINA discretion to determine eligibility for benefits or to construe a policy term.

---

[5] By its terms, the Policy is governed by Illinois law.

[6] Generally, ERISA statutes supersede state laws that "relate to" employee benefit plans. 29 U.S.C. § 1144(a). However, in what is commonly known as the "saving clause," ERISA also provides that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A).

The Court interprets the Policy terms using their ordinary and popular meaning, and as an insured of average intelligence and experience would interpret them. *See Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir. 1992). For the arbitrary and capricious standard to apply, the Policy must advise a participant in clear terms that the administrator has authority to determine claims or construe terms in the plan. *See Herzberger v. Standard Ins. Co*., 205 F.3d 327, 333 (7th Cir. 2000). This is because one of the primary functions of ERISA is to require that participants are fully advised of their rights under employee benefits plans.[7]

The Policy does not expressly address LINA's role in determining claim eligibility. As to claim allowance, the Policy provides that "Satisfactory proof of Disability must be provided to the Insurance Company" and that the "Insurance Company will require continued proof of the Employee's Disability" for for benefits to continue.

With regard to termination of benefits, the language is more specific. It provides that disability benefits will end on "the date the Insurance Company determines an Employee is not disabled."

The parties have focused upon the eligibility and allowance provisions of the Policy. This Court would focus on those as well if the issue concerned claim allowance.[8] However, the

---

[7] *See, e.g.,* 29 U.S.C. §§ 1022(a), 1102(a)(1) (requiring benefits plans to be in writing and to be "written in a manner calculated to be understood by the average plan participant"). As the Supreme Court has noted, ERISA requires written benefits plans "in order that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (internal quotation marks omitted).

[8] The language of the Policy in this respect is inartful, and the question of whether it would be sufficient to convey the discretion of the insurance company to benefits would be a close one. *See Nance v. Sun Life Assurance Company of Canada*, 294 F.3d 1263, 1267 (10th Cir. 2002) (interpreting language similar to that in this case); *Ray v. Unum Life Ins. Co. of Am.*, 314 F.3d 482, 486 (10th Cir. Colo. 2002) (same).

10

controversy before the Court concerns the termination of benefits at the 24 month juncture. Thus, the Court focuses on the more specific language that expressly applies to termination of benefits. With regard to termination, the language of the Policy is sufficiently specific to reflect the discretion given to LINA because it clearly states that LINA may terminate benefits if it "**determines**" that an insured is not disabled. As to this issue, the Court will apply the arbitrary and capricious standard.[9]

When examining a case under an arbitrary and capricious standard, the reviewing court upholds an administrator's decision if it is reasonable and made in good faith. *See Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citations omitted). The reviewing court "need only assure that the administrator's decision falls somewhere on a continuum of reasonableness – even if on the low end." *Id.* Such is to say, the decision must only be "sufficiently supported by facts within [the administrator's] knowledge to counter a claim that it was arbitrary or capricious." *See id.* An interpretation of a plan is arbitrary and capricious if it is lacking in substantial evidence or contrary to law. *See Toriz v. Ball Corp*, 862 F2d 1428,1429 (10th Cir 1988). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support an administrator's decision. *See Caldwell v. Life Ins Co of North America*, 287 F3d 1276, 1282 (10th Cir 2002). In other words, it is more than a scintilla, but less than a preponderance. *Rekstad v. U.S. Bancorp*, 451 F. 3d 1114, 1119-20 (10th Cir. 2006).

When, as in this case, the plan administrator is also the plan's insurer, there is an inherent

---

[9] As noted infra, this determination ultimately has no practical significance. Even if the Court reviewed the decision de novo, it would nevertheless remand the matter because there is insufficient evidence in the record to determine whether the benefits should be determined or not.

conflict of interest between the discretion in paying claims and the need to stay financially sound. *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1006 (10th Cir. 2005). When a plan administrator is operating under a conflict of interest, that conflict must be considered as a factor in determining whether there has been an abuse of discretion. *See Firestone*, 489 U.S. at 115. Under such circumstances, a court is less deferential to the decision made. The plan administrator bears the burden to establish that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. *See Fought*, 379 F.3d at 1003, 1006.

## V.     ANALYSIS

Ms. Gielas argues that LINA wrongly relied on Dr. Cohen's opinions when it terminated her benefits after 24 months of eligibility, and that the evidence supports a conclusion that she is disabled within the meaning of the Policy terms. LINA counters that it reasonably terminated Ms. Gielas's benefits based on Dr. Cohen's opinion that Ms. Gielas could return to work in her previous position, as well as Dr. Evans's opinion that Ms. Gielas did not have a neurological or neuropsychological problem that would preclude her from returning to work, Dr. Fox's deference to that opinion, and Dr. Woodcock's non-response thereto. Further, LINA argues that it reasonably elevated Dr. Cohen's opinion over those of Ms. Gielas's treating physicians and her subjective complaints because Dr. Cohen's opinion was both reasonable and based on the record evidence.

The Court observes a marked contrast between Dr. Cohen's opinion and the other physicians' opinions in the record. From the outset, all of the physicians who actually examined and treated Ms. Gielas and who submitted opinions on the matter opined that Ms. Gielas either

could not return to her previous occupation. There is disagreement as to whether Ms. Gielas suffered from physical problems, neurological problems, psychological problems, or some combination thereof, but regardless of the type of problem diagnosed, all of Ms. Gielas's treating physicians arrived at the same conclusion. Of her treating physicians, only Dr. Evans initially opined that Ms. Gielas's impairments would not prevent her from working, based on another physician's opinion that is not in the record and that LINA never saw. Even so, Dr. Evans later clarified that his initial opinion was only that Ms. Gielas did not have a neurological or neuropsychological condition that would preclude her from working, and stated his opinion that Ms. Gielas's psychological condition and symptoms would indeed prevent her from working in her previous position. The record reflects that Dr. Hebda found that Ms. Gielas could not function to the fullest of her intellectual capabilities and that her impairments would adversely affect her ability to work. Drs. Fox, Woodcock, and Witty found that she could not return to her previous occupation.[10] Even Dr. Shallcross, who did not examine Ms. Gielas, but reviewed her medical records and spoke with her care providers, found that Ms. Gielas was unable to return to her previous occupation.

Only Dr. Cohen and LINA's in-house physician Dr. Hall – neither of whom examined Ms. Gielas and both of whom summarily dismissed her treating physicians' opinions and her complaints – are of the opinion that Ms. Gielas can return to her previous occupation. Given that Ms. Gielas suffered a brain injury, there is heightened value in examining her and witnessing her abilities, behaviors, and symptoms, such as her speech impediments and cognitive deficits. Based solely on review of Ms. Gielas's file, Dr. Cohen's and Dr. Hall's opinions are the least

---

[10] Dr. Witty also opined that Ms. Gielas might be able to perform other work, subject to certain restrictions.

informed of all the opinions in the record. They are outlier opinions without substantial support, and as a consequence the Court discounts them.

In addition, these opinions do not address the requirements for the termination or continuance of disability payments. Because Ms. Gielas received 24 months of disability payments, a new definition of disability became applicable. Under the Policy, Ms. Gielas is disabled if: (1) she is unable to perform all the material duties of any occupation for which she may reasonably become qualified based on education, training, or experience; or (2) if solely due to injury or sickness, she is unable to earn more than 80% of her indexed covered earnings. The record evidence in this case all pertains to whether Ms. Gielas could return to her previous occupation. There is no evidence as to what sorts of occupations Ms. Gielas might become qualified to perform or whether she might earn more than 80% of her indexed covered earnings. In addition, there is no indication that these issues were ever considered.

For these reasons, the Court finds that LINA has not met its burden to establish that its termination of Ms. Gielas's benefits was supported by substantial evidence and concludes that its decision was arbitrary and capricious. This does not result in an allowance of continuing benefits, however, because there was and still is insufficient evidence upon which LINA, the Court, or any other decision-maker can make the appropriate determination. As a consequence, the matter must be remanded.

**VI.     Conclusion**

Based on the foregoing, **IT IS ORDERED** that this matter is **REMANDED** to the plan administrator to make further findings consistent with this order.

DATED this 17th day of September, 2009.

                              **BY THE COURT:**

                              *Marcia S. Krieger*
                              _____

                              Marcia S. Krieger
                              United States District Judge